**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

**JOHN W. BLASSINGAME, JR.,**
**ADMINISTRATOR OF THE ESTATE OF**
**JOHN W. BLASSINGAME,**
      -Plaintiff


      -vs-                                                    3:02-CV-2009 (TPS)


**YALE UNIVERSITY,**
      -Defendant


**MEMORANDUM OF DECISION**

This is a contract interpretation case between the estate of John W. Blassingame ("Professor Blassingame") and Yale University. The late Professor Blassingame was a full professor at Yale University and editor of a book called *The Frederick Douglass Papers*. The court is asked here to interpret a "permission fee" provision included in a contract between Professor Blassingame and Yale University Press ("Yale Press" or "Yale"). How this provision is interpreted will determine who is entitled to those fees.

The estate argues that Professor Blassingame was, and the estate is, entitled to 50% of the permission fees collected since 1979 as well as those fees collected in the future. Yale asserts that Professor Blassingame was never personally entitled to the permission fees and that 50% of the fees, minus costs, have been donated to an organization called The Association for the Study of Afro-American Life and History ("ASALH") since 1979, as was

intended under the contract.

A one day bench trial was held before the undersigned on April 23, 2007. The court's findings of fact and conclusions of law are as follows.

## I. FINDINGS OF FACT

**A. <u>Background</u>**

On October 11, 1976 Professor Blassingame entered into a written contract ("the 1976 contract") with Yale Press. (Def's Ex. 1.) The contract involved a collection of documents called *The Frederick Douglass Papers*. Professor Blassingame was to collect, edit, annotate and comment on the documents. The goal was to create and publish an authoritative source of all of the documents authored by the prominent African-American figure. "The Frederick Douglass Papers Project" is part of a larger Yale Press venture called "The Papers Project" which produces authoritative collections of documents authored by historically important figures.

On February 7, 1979 Professor Blassingame executed another written contract ("the 1979 contract") with Yale Press which superseded the 1976 contract. (Pl's Ex. 1.) Under paragraph one, which was identical to paragraph one in the 1976 contract, Professor Blassingame assigned to Yale Press "the exclusive right to publish the work in all forms and in all languages during the full term of copyright and any renewal thereof throughout the

world." (*Id.*)  The primary purpose of both the 1976 and 1979 contracts was to transfer to Yale University the copyrights to *The Frederick Douglass Papers* and any subsequent volumes produced.  The contracts also specified where the money that was generated by the books would go.

It is undisputed that the purpose of the 1979 contract was to modify the **royalty** fee provision included in the 1976 contract.[1] Under the 1976 contract, royalty payments were to be divided equally among (1) The Department of History, Yale University; (2) The Department of Afro-American Studies, Yale University; and (3) ASALH located in Washington D.C.  (Def's Ex. 1 ¶ 23.)  The 1979 contract modified the agreement so that ASALH would receive all of the royalty payments.  (Pl's Ex. 1 ¶¶ 10, 11.)

**B.   The 1979 Contract**

Paragraphs 10 through 12 of the 1979 contract distinguish between three types of fees that might be collected by Yale Press with respect to *The Frederick Douglass Papers*.  Paragraphs 10 and 11 dictate how **royalty** payments would be distributed, while paragraph 12 outlines the payment distribution formula for both **permission** fees and **licensing** fees.

---

[1] As will become clear, who would receive **permission** fees after the 1979 modifications is the material fact in dispute here.  There is no dispute, however, that **royalty** fees would go to ASALH. The distinction between a royalty fee and a permission fee is discussed later herein.

Royalty fees are the monies collected as a result of the sale of the book itself. Permission fees are acquired when other authors seek permission to quote certain portions of the text for use in other works. Licensing fees[2] are collected in the event Yale Press decides to allow another publisher to publish future versions of the book.

In relevant part, paragraph 10 of the 1979 contract reads as follows:

> 10   We agree to pay the following royalties on the clothbound edition, subject to the provisions of succeeding paragraphs of this agreement:
>
> a.   On regular sales in the United States:
>
> 3% of the list price, payable to The Association for the Study of Afro-American Life and History, 1401 14th Street N.W., Washington, D.C. 20005.

In the first sentence of the above quoted text, after the word "pay" and preceding the word "the" there is a space wherein a word appears to have been "whited out" or otherwise deleted. The court finds that the obliterated text was the word "you." Thus, at one

---

[2] Paragraph 12 as well as subsequent paragraphs discuss the distribution of licensing fees as well as permission fees. One of the facts found by the court is that the right to publish *The Frederick Douglass Papers* was never licensed to any other entity. (Pl's Ex. 2.) Since 1979, therefore, *The Frederick Douglass Papers* have not generated any licensing fees. Therefore, paragraphs 13 and 14 of the contract, which discuss other types of licensing fee arrangements, are not at issue here. To the extent paragraph 12 discusses licensing fees it is also not at issue. Thus, the only issue is who should have received the permission fees collected and discussed in paragraph 12.

point the first sentence read "We agree to pay *you* the following royalties. . . ."

Likewise, paragraph 11, in relevant part, reads as follows:

> 11   We shall have the exclusive right, at our option, to publish a paperbound edition of the work, or any part of it[.] We agree to pay a royalty of 1 ⅓% of the list price, payable to The Association for the Study of Afro-American Life and History, 1401 14th Street N.W., Washington, D.C. 20005.

In the second sentence, after the word "pay" and preceding the word "a" the word "you" is clearly crossed out. Thus, like in paragraph 10, the second sentence of paragraph 11 appears to have once read "We agree to pay *you* a royalty . . . ." In both paragraphs 10 and 11 the court finds that it was intended by the parties that the name and address of ASALH replace the deleted word "you."

In contrast, paragraph 12 of the 1979 contract reads as follows:

> 12   We shall have the exclusive right to license other publishers to publish and sell other editions of the work. We shall also have the exclusive right to grant permission to use material in the work. If rights of publication are so licensed or permission so granted, we agree to pay you 50% of our net receipts after deduction of all reasonable expenses arising from the licensing of such rights or granting of such permission.

The word "you" in the second sentence of paragraph 12 is not omitted, crossed out or in any way obliterated.

**C. Testimonial Evidence**

   **1. Testimony of John Blassingame Jr.**

The first of two witnesses that testified at the bench trial was the plaintiff John Blassingame Jr. ("John Blassingame"). His testimony was credible. The court finds the following facts based on that testimony.

John Blassingame is the son of Professor Blassingame. Professor Blassingame died in 2001. John Blassingame is the co-administrator of Professor Blassingame's estate. He believes his father was owed permission fees under paragraph 12 of the 1979 contract. John Blassingame was not personally involved with the formation of either the 1976 or the 1979 contracts.

John Blassingame, as co-administrator of his father's estate, has never received any permission fees from Yale Press, nor did his father while he was alive. He has not, and his father did not, ever receive any royalty statements, prior to the commencement of the instant litigation, indicating how the royalty and permission fees were distributed. John Blassingame did contact Yale Press in an attempt to get information regarding the distribution of fees and when he did so it is likely that he spoke with someone in the Yale University General Counsel's Office. John Blassingame was sometimes represented by counsel when he attempted to make these contacts and understands that ethical rules prohibit attorneys from speaking with opposing parties whom they know to be represented by

counsel.

John Blassingame knows of no evidence that would indicate that Professor Blassingame ever objected to ASALH receiving all of the permission fees.

2.  **Testimony of Linda Klein**

The second and final witness called was defendant's witness Linda Klein. Her testimony was also credible and the court therefore adopts as findings of fact the following.

Linda Klein is the director of intellectual property at Yale Press. She has been at Yale Press since 1995 and served as intellectual property director since 1998. Individual professors, in conjunction with Yale Press, regularly undertake the task of collecting and annotating authoritative collections of documents authored by historically important figures. The effort is collectively known as "The Papers Project." The 1976 and 1979 contracts here are typical of other Papers Project contracts made at that time. Normally, however, all the of royalty, license and permission fees that are generated from a particular Papers Project are redirected back into the project itself.

In Ms. Klein's experience, no professor or other editor has ever received any portion of the fees directly generated from his or her work on the Papers Project.[3] She believes that the

---

[3]

She did testify that one professor who worked on a project known as the "Johnson Papers" may have received money on a

professors view it as part of their scholarly mission. She also could not recall any instance when permission and licensing fee payments were not made to the same source as royalty payments. In other words, it is customary in this profession for permission payments to "follow" the royalty payments.

All royalty, permission and licensing fees derived from a Papers Project go into an account called a "royalty account." There is no separate "permission account" or "license account." Since 1979, all money that has gone into *The Frederick Douglass Papers* royalty account has been distributed to ASALH in accordance formulae outlined in paragraphs 10 through 12.

The Papers Project does an accounting of all Papers Project royalty accounts each year around March. All yearly royalty statements for The Frederick Douglass Papers Project were sent to ASALH. Professor Blassingame was never provided any yearly statements. *The Frederick Douglass Papers* file at Yale Press does not indicate that Professor Blassingame ever voiced any concern over where the fees were going.

Ms. Klein believes that the intent of the 1979 contract was to direct that all fees derived from *The Frederick Douglass Papers* be distributed to the ASALH. She was not, however, personally involved in the formation of either the 1976 or the 1979 contract.

---

derivative work that he did based on the documents contained in *The Johnson Papers* volume.

Ms. Klein acknowledges that the word "you" is obliterated in paragraphs 10 and 11 of the contract, but not in paragraph 12. Yale Press has known about the estate's claim since approximately 2002, but has continued to pay ASALH because they believe that doing so comports with the contract.

**D.    1983 Letters**

The defendant introduced three other documents at trial. The following additional facts are found based on this evidence.

On March 21, 1983 the Executive Director of ASALH sent a letter to Yale Press. (Def's Ex. 3.) This letter questioned when ASALH would receive its first check from the royalties. The letter also references an invoice sent to ASALH from Yale Press and inquires why the invoice deducts the cost of six volumes of "Douglass Papers, Ser. One V 2 at $45.00 each less discount. . . ." On April 26, 1983 Maureen MacGrogan, a representative of Yale Press, sent a letter to Professor Blassingame informing him of the contents of the March 21st letter. (Def's Ex. 4.)

In a letter dated May 4, 1983 Professor Blassingame replied to ASALH regarding their concerns. (Def's Ex. 2.) The body of that letter reads as follows

> Regarding the attached, it is standard practice to charge against royalties all additional complimentary copies ordered by the author (me). Since the Association was the sole recipient of royalties from volumes one and two, naturally the cost of the books was deducted from those royalties. No conspiracy to defraud here.
>
> Incidentally, I hope that the Executive Council and

the membership-at-large have been informed that, in recognition of the assistance the Association provided in launching the Douglass Papers Project, Yale University Press paid ASALH a portion of royalties on volumes one and two of the <u>Douglass Papers</u>. As you know this is an unusual arrangement for a University Press to make.

(Def's Ex. 2) (underlining and parenthetical in the original).

## II. CONCLUSIONS OF LAW

The only issue here is one of contract interpretation. Specifically, the question is whom the parties intended to receive permission fees under paragraph 12 of the 1979 contract. If the word "you" was intentionally left unaltered in paragraph 12 and is interpreted as meaning "John W. Blassingame Sr." in his individual capacity, then the estate has proved its case. If, however, the parties had intended to replace "you" with identification information for ASALH, like they had in the preceding two paragraphs, then the defendant has prevailed.[4]

The applicable law here is straightforward. "A contract is to

---

[4] There is also a third possibility. It could be found that both parties to the contract intended to leave the word "you" unaltered in paragraph 12 while changing it to "ASALH" in paragraphs 10 and 11, therefore directing that royalties go to one source while permission and licensing fees were intended to go to another. In this case, it would be necessary to determine to whom "you" was referring. Ms. Klein's testimony suggests that, at least with regard to the fee distribution provisions, "you" meant "the editor, as representative of the particular Papers Project." If the court were to find that was the case, then the result would be that Yale should have been paying the permission fees to The Frederick Douglass Papers Project, not ASALH. Because the court ultimately finds that it was not the intention of both parties to the contract to leave the word "you" included in paragraph 12, this possible third interpretation will not be discussed further.

be construed according to what may be assumed to have been the understanding and intention of the parties." Lar-Rob Bus Corp. v. Fairfield, 170 Conn. 397, 407 (Conn. 1976); see also Grigerik v. Sharpe, 247 Conn. 293, 311 (Conn. 1998) (quoting Lar-Rob). "The primary and ultimate purpose of interpretation is to determine and make effective the *intention of the contracting parties* . . . No contract should ever be interpreted and enforced with a meaning that neither party gave it." 6-26 Corbin on Contracts Supp. to § 572B (emphasis in original). Moreover, "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (Second) Contracts, § 202(4). What the parties intended by particular contract language is typically a factual determination. Poole v. Waterbury, 266 Conn. 68, 88 (Conn. 2003).

The plaintiff urges the court to find that the word "you" was intentionally left unaltered in paragraph 12 of the 1979 contract. If that fact is established, the plaintiff argues that the court should construe "you" as meaning "Professor John W. Blassingame Sr." in his individual capacity. Under this interpretation, Professor Blassingame himself was entitled to 50% of all permission fees.

Plaintiff contends that Professor Blassingame's approximately 22 years of acquiescence in the arrangement should be discounted in light of the fact that Yale Press never provided him any royalty statements. If he had received such statements, the argument goes, he would have discovered that permission fees were going to ASALH and objected as such.

Plaintiff's counsel also advanced two seemingly contradictory arguments at oral argument. At one point counsel argued that ambiguities should be interpreted against the party that drafted the contract. This is certainly a valid maxim of contract interpretation which might aide the estate's case since Yale unquestionably drafted the 1979 contract. However, later, plaintiff's counsel strenuously asserted that the contract was clear on its face and that extrinsic evidence should not be used to read ambiguities into an otherwise unambiguous contract.

Yale's argument, as the court understands it, is as follows. The word "you" was used throughout the Papers Project contracts at the time here at issue. In retrospect, the term is not accurate. The use of "you" was admittedly careless and sloppy. It would have been more accurate to say "you, as a representative of *The Frederick Douglass Papers*" or simply "*The Frederick Douglass Papers*." Regardless of the term used, Yale contends, the default fee provision in all Papers Project contracts called for fees to be distributed back into the specific Papers Project, not disbursed to

the individual editor.

In this particular contract, Yale argues that the default fee provisions were modified. Yale points to the removal of the word "you" in paragraphs 10 and 11 and the name and address of ASALH put in its place. Yale contends that the fact that the word "you" was not deleted and replaced with "ASALH" in paragraph 12 and subsequent paragraphs is simply an oversight. The intent of the parties was never to direct royalty fees to one source and permissions fees to another. The parties also did not intend for Professor Blassingame ever to receive fees personally. Instead, Professor Blassingame wanted all of the money to go to ASALH, and Yale obliged.

In support of its argument Yale highlights the fact that for 22 years Professor Blassingame acquiesced in the arrangement without objection. Yale also points to the 1983 letters as evidence that Professor Blassingame knew that the fee provisions in the 1979 contract were not typical.

The court finds that the 1979 contract is inartfully drawn. The question is whether the court will hold Yale's oversight against it or whether the contract will be interpreted to conform with what the court is throughly convinced were the intentions of the parties at the time. Clearly, the later is the better option.

That Yale believed that ASALH should receive all of the fees generated from *The Frederick Douglass Papers* under the contract

cannot reasonably be questioned. The evidence establishes that for twenty-two years Yale paid the permission fees to ASALH although it received no benefit from doing so. Even after being informed of this lawsuit, Yale continued to pay ASALH all of the royalty and permission fees generated by *The Frederick Douglass Papers* to ASALH.

The court further finds that Professor Blassingame also intended that all the fees generated from *The Frederick Douglass Papers* were to be disbursed to ASALH. When he signed the contract, Professor Blassingame was well aware that Yale Press would redirect any fees generated by the Papers Project's texts back into the individual Papers Project that generated the revenue. There is simply no evidence that Professor Blassingame ever believed that he was to receive any money personally. Rather, in light of his academic interests, Professor Blassingame affirmatively changed the standard practice by redirecting the funds to an organization that shared his scholarly ideals. He knew full well that this arrangement was unusual and, in 1983, told the director of ASALH as much. (Def's Ex. 2.)

The argument that Professor Blassingame would have objected to ASALH receiving permission fees had he simply been provided with the royalty statements evidencing the transactions is unavailing. A rational person who believed he was owed money would not have remained so silent for so long. From all the available evidence,

Professor Blassingame was an intelligent, educated, and accomplished individual who became a tenured and respected member of Yale's academic community. He was clearly a rational man. His correspondence with the ASALH, moreover, indicates that he was aware of the intricacies and implications of the relationships that were created by the 1976 and 1979 contracts. To suggest otherwise -- that Professor Blassingame was somehow ignorant or unaware that ASALH was receiving all monies generated through royalties and permissions -- is dubious. Had this arrangement not been acceptable, and not in keeping with Professor Blassingame's intent in entering into the contracts, the court finds that Professor Blassingame would have come forward and demanded the 50% of the permissions income that his estate now seeks. Instead, Professor Blassingame acquiesced in the permissions income following the royalties for over twenty years, not just because this is the norm for the Papers Project, but because this was his desire.

### III. CONCLUSION

The court concludes that both parties to the 1979 contract intended ASALH to receive all of the fees generated by *The Frederick Douglass Papers*. The inclusion of the word "you" in paragraph 12 was a drafting error and does not conform with the true wishes of the parties at the time of formation.

This case is before the undersigned pursuant to 28 U.S.C. § 636(c). Based on these findings as well as the other findings and

conclusions made herein, the court finds in favor of the defendant. The clerk is directed to enter **JUDGMENT** for the **DEFENDANT** and close this case.

**IT IS SO ORDERED**

**Dated at Hartford, Connecticut this 10th day of May, 2007.**

                                            **/s/ Thomas P. Smith**
                                            **Thomas P. Smith**
                                            **United States Magistrate Judge**